UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NEW YORK SMSA LIMITED PARTNERSHIP
*d/b/a* VERIZON WIRELESS,

                      Plaintiff,

-against-

THE CITY OF RYE, THE CITY OF RYE CITY
COUNCIL, and KERRY LENIHAN, *in his official
capacity as Building Inspector for the City of Rye*,

                      Defendants.

No. 19 Civ. 10159 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

    Plaintiff New York SMSA Limited Partnership, doing business as Verizon Wireless, ("Plaintiff"), commenced this lawsuit against Defendants the City of Rye, its City Council, and its Building Inspector, Kerry Lenihan, alleging that they violated the Telecommunications Act of 1996 ("TCA"), 47 U.S.C. §§ 253 and 332, after they denied Plaintiff certain special use permits to install a public utility telecommunications and personal wireless services facility on a building's rooftop. (Compl. ¶¶ 1–5, ECF No. 1.)

    After the parties completed discovery, but before they filed any of their motion papers with respect to Defendants' anticipated summary judgment motion, the parties reached a settlement as to all claims. (ECF No. 36.) Subsequently, the Court entered the parties' "Stipulation of Settlement and Consent Order" (ECF No. 37) (the "Consent Order"), wherein the parties set forth the terms of their settlement agreement and the stipulated dismissal of the instant case with prejudice. (*Id.*)

    Presently pending before the Court is Plaintiff's motion to enforce the parties' settlement agreement and to hold Defendants in civil contempt under Federal Rule of Civil Procedure 70(e). (ECF No. 43.) For the following reasons, the Court GRANTS Plaintiff's request to enforce the parties' settlement agreement and DENIES its request to hold Defendants in civil contempt.

## BACKGROUND

The following facts are derived from the parties' briefing submissions and other relevant filings on the docket.

### I. Plaintiff applies for a Special Use Permit from Defendants to install a wireless telecommunications facility; Defendants deny the application

Plaintiff is licensed by the Federal Communications Commission ("FCC") to provide wireless telephone and telecommunications services throughout the nation, including the New York metropolitan area. These services include telecommunications services, commercial mobile services, and personal wireless services, as those terms are used and defined under sections 153(53) and 332(c)(7)(C) of the TCA. (Czarniawski Decl. ¶ 2, ECF No. 44-1.)

In February 2019, to fill certain gaps in service within the City, Plaintiff began the process to obtain permission from Defendants to install a wireless telecommunications facility on the rooftop of a commercial telecommunications building that Plaintiff owns at 182 Purchase Street in Rye, New York. (*Id.* ¶ 6.) Plaintiff states that it intended the proposed facility to have relatively small antennas and related equipment that would be entirely camouflaged in materials that matched the façade of the building and would fill the significant gap in reliable service in the vicinity. (*Id.* ¶ 7). In July 2019, Plaintiff applied for a Special Use Permit for the proposed installation. (Cohn Decl. ¶ 6, ECF No. 45.) After reviewing Plaintiff's application for a Special Use Permit, Defendants denied it for reasons not relevant to the instant motion. (*See id.* ¶¶ 6–11.)

### II. Plaintiff commences the instant lawsuit against Defendants; the parties settle

On November 1, 2019, Plaintiff commenced the instant lawsuit, alleging that Defendants violated the TCA because the denial of Verizon's application was "unreasonable" and "unsupported by substantial evidence contained in the written record, as is required by federal law." (Compl. ¶¶ 2–3.)

2

During the course of the litigation, the parties engaged in settlement discussions. (Cohn Decl. ¶ 12; Czarniawski Decl. ¶ 8.) Throughout these discussions, Plaintiff informed Defendants that its intention was "to install relatively small and concealed antennas on the rooftop of a commercial telecommunications building[.]" (Czarniawski Decl. ¶ 8.) Defendants instead preferred that Plaintiff build a new free-standing tower on City-owned property in the Rye City Center that was adjacent to the Metropolitan Transportation Authority ("MTA") railroad parking lot, which is not surrounded by residential units. (*Id.*; Cohn Decl. ¶ 13.) The parties eventually agreed to settle the litigation by Plaintiff leasing the City-owned property in the City center adjacent to the MTA parking lot (the "Lease Area"), on which Plaintiff would build an 80-foot free-standing tower (the "Unipole"). (Cohn Decl. ¶ 14; Czarniawski Decl. ¶¶ 8–9.)

Thereafter, Plaintiff hired WFC Architects to design, draw, and create plans for the Unipole to be built on the Lease Area (the "Plans"). (Maher Decl. ¶ 3, ECF No. 44-2.) The Plans describe the Unipole as an 80-foot structure sitting at "+/- 95' AMSL (NGVD 29)," which means 95 feet above mean sea level according to the National Geodetic Vertical Datum of 1929—a measuring system of ground elevation that has been used by surveyors and engineers for most of the twentieth century. (*Id.* ¶¶ 5–7.) Because the City did not provide a survey of the Lease Area at the time of settlement, WFC Architects prepared the Plans with estimates obtained from online resources such as Google Earth, which estimates of NGVD 29 may be off by as much as 30 meters (or around 98 feet). (*Id.* ¶¶ 5–6.) The parties "settled their dispute in part by agreeing to the Plans." (*Id.* ¶ 8.)

After the parties completed discovery, but before they filed any of their motion papers with respect to Defendants' anticipated summary judgment motion, the parties informed the Court that they had reached a settlement on November 18, 2020. (ECF No. 36.) That same day, the Court

3

entered the Consent Order, wherein the parties set forth the terms of their settlement agreement and the stipulated dismissal of the instant case with prejudice. (*See* Consent Order, ECF No. 37.)

**III.    The Consent Order, dated November 18, 2020**

By the Consent Order, the parties agreed to dismiss this case with prejudice under a set of terms and conditions that outline the steps the parties would take for Plaintiff to lease the Lease Area and build the Unipole as agreed. (*Id.*) In relevant part, the Consent Order first provides that upon the Court entering the same,

> Plaintiff will submit an application for a building permit to install a unipole not to exceed 80 feet and a fenced compound for related equipment and telecommunications facility, the "Unipole Facility", at the alternative City-owned Property ("City Property") as described and shown on the exhibit attached hereto as Exhibit A, and pursuant to Section 4 herein. Notwithstanding any federal law to the contrary, the height of the unipole shall be limited to 80 feet unless approved by the Rye City Council, to accommodate Plaintiff and potentially two Additional Providers (as that term is defined in the lease agreement that is described in paragraph 6 below). Should the Rye City Council at any time approve an extension in height of the t1nipole to accommodate an Additional Provider, Plaintiff shall have the right to relocate its antennas and occupy the highest portion of the unipole at no charge, with the Additional Provider being responsible for the extension and occupying Plaintiffs prior slot when the unipole existed at 80 feet in height.

(*Id.* ¶ 1.) As discussed in this paragraph, Exhibit A—the "Drawing of [the] Unipole Facility"—comprises of the Plans that WFC Architects created and which provide the specifications for the Unipole and of the Lease Area where it would be located. (Maher Decl. ¶ 5.)

The Consent Order further provides that

> Defendants shall issue Plaintiff a building permit for the Unipole Facility within 30 days of the receipt of a complete Building Permit application with the Unipole Facility as designed and located as shown on Exhibit A. Defendants acknowledge that only a building permit and a certificate of compliance will be needed for the Unipole Facility and no other City approval will be required for the Unipole Facility. Defendants will assist Plaintiff in obtaining any other non-city governmental approvals necessary and shall not take any action that would be in opposition to the issuance of any other such governmental approvals. The Building Permit application for the Unipole Facility shall be deemed complete if it consists of construction drawings in conformance with Exhibit A herein, the contractor's insurance certificates, and the customary City of Rye Building Permit Application

> form and fee, and no other items. Any building permit fees and certificate of occupancy fees paid for the Purchase Street Facility shall be applied to the fees due for the Unipole Facility.

(Consent Order ¶ 5.)

The Consent Order also provides that the parties "independently entered" into a lease agreement setting forth the terms and conditions under which Plaintiff would lease the Lease Area from the City (the "Lease Agreement"). (*Id.* ¶ 5.) The Consent Order expressly incorporates the Lease Agreement by reference. (*Id.*)

The Consent Order finally provides that upon the Court entering the same, "this action will be dismissed with prejudice, and without fees, costs, disbursements, damages, interest[,] or attorneys' fees against any party, except as otherwise set forth herein. Any party may, upon notice, seek to enforce this Consent Order." (*Id.* ¶ 12.)

## IV. The Lease Agreement, dated November 30, 2020

The Lease Agreement, which the Consent Order incorporates by reference, first provides in relevant part that

> [The City] hereby leases to [Plaintiff] and grants to [Plaintiff] the right to install, maintain and operate Communications Equipment ("Use") upon the Premises (as hereinafter defined), which are a part of that real property owned by [the City] at the End of McCullough Place, a/k/a End of Third Street, City of Rye, New York and known on the City of Rye tax assessor's map as Section 146.07, Block 1, Lot 23 (the "Property"). The Property is legally described or otherwise known on the tax map es shown on Exhibit "A" attached hereto and made a part hereof. The Premises leased to [Plaintiff] are a portion of the Property and shall not exceed 900 square feet and are generally shown on Exhibit "B" attached hereto and made a part hereof (hereinafter, the "Premises"). [Plaintiff] may survey the Premises. Upon completion, the survey shall replace Exhibit "B" in its entirety. For the purposes of this Agreement, the term "Communications Equipment" shall be defined as "all elements of a facility used in connection with the provision of any wireless telecommunications, including, without limitation, the antenna, base station, tower, and accessory facilities or structures serving that base station."

(Mot., Ex. 3 (Lease Agreement) ¶ 1, ECF No. 44-6.)  As discussed in this paragraph, Exhibit B comprises of the Plans that WFC Architects created and that provide the specifications for the

Unipole and of the Lease Area where it would be located. (Maher Decl. ¶ 5.) Simply put, at the time the parties entered into the Lease Agreement on November 30, 2020, Exhibit B in the Lease Agreement was the same as Exhibit A in the Consent Order.

The Lease Agreement further provides that it is "contingent upon the Parties entering into that certain Stipulation of Settlement . . . , settling Docket No. 19-cv-10159 (NSR) (JCM)." (*Id.* ¶ 4.) The Lease Agreement also provides that Plaintiff will install the Unipole on the Lease Area at its own expense, and that its installation will be at its discretion,

> provided, however, [Plaintiff's Unipole] structure shall consist of a unipole with a maximum height of 80 feet as shown on Exbibit B and the diameter of the unipole shall be the same for all 80 feet of the unipole. In addition, [Plaintiff] shall construct the unipole so that [Plaintiff] will occupy the top 10-12 feet of the unipole and at least two Additional Providers (as that term is defined in paragraph 19(b) below) may occupy the space beneath. [Plaintiff] shall have the right to replace, repair, add or otherwise modify its Communications Equipment, including, without limitation, its tower structure, antennas, utilities, conduits, fencing and other screening, or other improvements or any portion thereof and the frequencies over which the Communications Equipment operates, whether or not any of the Communications Equipment is listed on any exhibit. Notwithstanding any law to the contrary, the height of the unipole shall not exceed 80 feet unless approved by the Rye City Council. [Plaintiff] shall use best efforts to locate the Unipole Facility as close to the MTA property line as possible to retain vegetation, and should [Plaintiff] need any waivers from the City's Zoning Code such waivers are hereby granted. Should at any time the Rye City Council approve an extension in height of the unipole to accommodate an Additional Provider, [Plaintiff] shall have right to relocate its antennas and occupy the highest portion of the unipole at no charge, with the Additional Provider being responsible for the extension and occupying [Plaintiff's] prior slot when the unipole existed at 80 feet in height. Prior to [Plaintiff] making any modification(s) to the communications facility, [Plaintiff] shall provide [the City] with the proposed plans to confirm that such changes do not require a building permit from the building inspector for such modification. Should the proposed changes require a building permit, the permit approval will not be subject to any discretionary reviews by [the City] or any of its Boards. . . .

(*Id.* ¶ 7.)

**V.       The December 2, 2020 Meeting and Plaintiff's subsequent survey of the Lease Area**

Shortly after settling the dispute and entering into the Lease Agreement, the parties convened at the Lease Area on December 2, 2020, to pick a paint color for the Unipole and get a general idea of where it should be placed within the Lease Area. (Maher Decl. ¶ 8; *see also* Consent Order ¶ 4 (". . . Plaintiff shall provide Defendants with color samples from which to choose the color of the unipole, and the parties shall agree on the color of the unipole within 30 days of the Court 'so ordering' this Consent Order.").) At the meeting, despite the City not bringing a survey of the Lease Area, the Mayor of the City chose a tree in the general vicinity of where he believed the Lease Area to be and stated that he would like the Unipole to be aligned with this particular tree as it was thought to be feasibly close to the property line as possible. A yellow caution vest was tied around the tree to designate it as chosen by the Mayor. (Maher Decl. ¶ 9; Cohn Decl. ¶¶ 16–17; Wilson Decl. ¶¶ 8–10, ECF No. 46.)

After the meeting, Plaintiff and WFC Architects engaged a New York State licensed land surveyor to perform a topographical survey of the Leased Area for a precise determination of the property boundaries and ground elevation. (Maher Decl. ¶ 10.) To assign a more precise ground elevation, the surveyor used the measuring system of the North American Vertical Datum 1988 ("NAVD") which is a newer measuring system than the NGVD 29 used in the Plans and much more accurate, since it is based on physical field verification using highly calibrated instrumentation and local benchmarks. (*Id.* ¶ 11.) The resulting survey indicates that the above-mean-sea-level ground elevation on the Lease Area is actually approximately "+/- 57' AMSL" and not "+/- 95' AMSL" as originally estimated. This means that the 80-foot Unipole would sit at an elevation that is 38 feet lower than originally estimated in the Plans agreed upon during the parties' settlement. (*Id.*)

Additionally, the survey determined the exact boundaries of the City-owned property at Rye City Center where the Unipole would be located. (*Id.* ¶ 14.) In fact, the survey revealed that the tree the Mayor had selected for the alignment of the Unipole during the December 2, 2020 meeting is not located on the City's property, but instead, on MTA's—which sits approximately 9-10 feet lower than where the Unipole is to be built. (*Id.*)

### VI. Plaintiff submits a building permit application for the Unipole under the Consent Order; Defendants refuses to approve the application

On April 12, 2021, Plaintiff submitted a building permit application to Defendants under the terms of the Consent Order. (*See* Mot., Ex. 4, ECF No. 44-7.) The application contained the survey with its revised ground elevation estimates and boundaries as an attachment. (*Id.*) The application also contained revised construction drawings placing the Unipole as close to the MTA property line as possible to retain vegetation as specified in the Consent Order. (Maher Decl. ¶ 15.) After reviewing the building permit application for completeness, Defendants deemed Plaintiff's application complete on June 28, 2021. (*See* Mot., Ex. 5, ECF No. 44-8.)

Before the July 28, 2021 deadline for Defendants to approve Plaintiff's building permit application under the Consent Order, on July 8, 2021, the parties met virtually via Zoom. (Czarniawski Decl. ¶ 14; Cohn Decl. ¶ 24; Wilson Decl. ¶ 18.) During the Zoom meeting, Defendants expressed their concerns regarding the revised estimates, and the parties were unable to agree on how to proceed. (Czarniawski Decl. ¶ 17; Cohn Decl. ¶ 24; Wilson Decl. ¶ 20.)

To date, the July 28, 2021 deadline for Defendants to approve Plaintiff's building permit application under the Consent Order has passed, and Defendants did not issue a building permit application. (*See* Consent Order ¶ 5 (providing that "Defendants shall issue Plaintiff a building permit for the Unipole . . . within 30 days of the receipt of [Plaintiff's complete building permit application].").)

**VII.    Plaintiff files the instant motion**

On August 4, 2021, Plaintiff requested leave to file the instant motion. (ECF No. 38.) Two days later, after Defendants responded in opposition, the Court granted Plaintiff leave to file its motion, for which it set a briefing schedule. (ECF Nos. 39 & 40.) After a series of extensions, the parties filed their respective briefing on November 3, 2021: Plaintiff's notice of motion (ECF No. 43), memorandum in support ("Motion," ECF No. 44), and reply ("Reply," ECF No. 48); and Defendants' response in opposition ("Response in Opposition," ECF No. 47), and two declarations with accompanying exhibits (Cohn Decl., ECF No. 45; Wilson Decl., ECF No. 46).

**LEGAL STANDARD**

**I.  Motion for Enforcement of a Settlement Agreement**

An action to enforce a settlement agreement is "in essence, [a] breach of contract action[ ] governed by state law." *Gomez v. Terri Vegetarian LLC*, No. 17-CV-213, 2021 WL 2349509, at *3 (S.D.N.Y. June 9, 2021) (quotation omitted). Thus, "where a federal suit has already been dismissed based on a settlement agreement, and the plaintiff thereafter asks the court to enforce the parties' agreement, the court must first satisfy itself that it has retained ancillary jurisdiction to act." *Romero v. New Blue Flowers Gourmet Corp.*, No. 16-CV-8753, 2021 WL 860986, at *2 (S.D.N.Y. Mar. 8, 2021) (citing *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 379–80 (1994)). If a court is to exercise ancillary jurisdiction over the enforcement of a settlement agreement, the court's order of dismissal must have either "(1) expressly retain[ed] jurisdiction over the settlement agreement, or (2) incorporate[d] the terms of the settlement agreement in the order." *Gomez*, 2021 WL 2349509, at *3 (quoting *Hendrickson v. United States*, 791 F.3d 354, 358 (2d Cir. 2015)).

"Where, after the requisite review, the district court enters a dismissal order containing an express retention of jurisdiction to enforce the parties' settlement agreement, the court may then

exercise ancillary jurisdiction and enforce the agreement according to its terms." *Romero v. New Blue Flowers Gourmet Corp.*, No. 16-CV-8753 (DF), 2021 WL 860986, at *3 (S.D.N.Y. Mar. 8, 2021) (citing *Minecci v. Carlyle at the Omni, Inc.*, 16-CV-5134 (JS) (GRB), 2019 WL 1760683, at *1 (E.D.N.Y. Mar. 21, 2019)). Additionally, "in this context, the court may proceed to enforce the agreement by entry of judgment." *Id.* (citing *Minecci*, 2019 WL 1760683, at *1–2).

A breach of contract claim under New York law has four elements: "'(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" *Salto v. Alberto's Construction*, LLC, No. 17-CV-3583, 2020 WL 4383674, at *6 (S.D.N.Y. July 31, 2020) (quoting *Planete Bleue Television, Inc. v. A&E Television Networks, LLC*, No. 16-CV-9317, 2018 WL 10579873, at *7 (S.D.N.Y. Sept. 19, 2018)). The party seeking to enforce the settlement agreement "has the burden of proof to demonstrate that the parties actually entered into such an agreement." *Id.* at *4 (quoting *Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc.*, 447 F. Supp. 2d 329, 335 (S.D.N.Y. Aug. 28, 2006)).

## II. Motion for Civil Contempt

Rule 70(e) "provides a remedy of contempt if a party fails to comply with a judgment requiring the performance of a specific act." *Ecopetrol S.A. v. Offshore Expl. and Prod. LLC*, 172 F. Supp. 3d 691, 695 (S.D.N.Y. 2016). A Rule 70 civil contempt sanction "'serves to coerce the contemnor into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance.'" *Carione v. United States*, 2012 WL 976049, at *7 (E.D.N.Y. Mar. 22, 2012) (quoting *Bd. of Trs. of the Loc. 295/Loc.-I.B.T. Emp. Grp. Pension Tr. Fund v. Hail Air Freight, Inc.*, 2008 WL 1758719 (S.D.N.Y. Apr. 16, 2008) (internal quotation marks and citation omitted)).

"In order to establish contempt, a movant must show by clear and convincing evidence: (1) a clear and unambiguous order; (2) clear and convincing proof of noncompliance of the order; and

(3) that the contemnor has not diligently attempted to comply in a reasonable manner." *Id.* (quoting *Perez v. Danbury Hosp.*, 347 F.3d 419, 423–24 (2d Cir. 2003); *accord Trs. of N.Y.C. Dist. Council of Carpenters Pension Fund v. Vintage Flooring & Tile, Inc.*, 2012 WL 2958177, at *2 (S.D.N.Y. July 20, 2012).

## DISCUSSION

By its motion, Plaintiff asks the Court to (1) enforce the settlement agreement between the parties after Defendants breached it; and (2) hold Defendants in contempt for failing to comply with the Consent Order—namely, for failing to "issue Plaintiff a building permit for the Unipole . . . within 30 days of the receipt of a complete Building Permit application . . . ." (Mot. at 12–15.)

In response, Defendants do not dispute that they breached the parties' settlement agreement by refusing to issue Plaintiff the building permit for the Unipole within 30 days of deeming Plaintiff's application complete. Instead, Defendants argue that there is good cause to rescind the settlement agreement based on a mutual mistake. (Resp. in Opp'n at 7–8.) Specifically, Defendants argue that when the parties signed the Consent Order on November 18, 2020, "both parties believed that the base of the Unipole could be located near to the grade of the MTA parking lot" and that the ground elevation estimates to be "+/- 95' AMSL" and not "+/- 57' AMSL" as Plaintiff's subsequent survey indicated—or 38 feet lower than originally estimated. (*Id.*) Further, Defendants argue that, even if the Court concludes there is no mutual mistake, the facts here "do not rise to the level of civil contempt and sanctions should not be imposed" as they "diligently reviewed and processed the Building Permit Application." (*Id.*)

Accordingly, the Court will first address whether there is good cause to rescind the settlement agreement based on a mutual mistake, and only if there is none, will the Court address whether holding Defendants in civil contempt is warranted.

I.     **The Court has ancillary jurisdiction**

As a threshold matter, the Court first notes that it is satisfied "that it has retained ancillary jurisdiction to act." *Romero*, 2021 WL 860986, at *2 (citing *Kokkonen*, 511 U.S. at 379–80). First, the Consent Order expressly provides that "[a]ny party may, upon notice, seek to enforce this Consent Order." (Consent Order ¶ 12.) And second, the Consent Order expressly sets forth the terms and conditions that the parties negotiated and agreed to comply with in exchange for stipulating the dismissal of the case. (*See id.* ¶ 9 ("Plaintiff and Defendants acknowledge that this Consent Order was the product of negotiation by all parties through their counsel . . . . The obligations of this Consent Order apply to and are binding upon the parties, and any successors and assigns or other entities or persons otherwise bound by law.").)

Furthermore, insofar as Plaintiff argues that Defendants breached the Lease Agreement, the Court is also satisfied that it has ancillary jurisdiction over such agreement. Not only did the parties enter into the Lease Agreement "contingent upon the Court entering [the] Consent Order," but they also incorporated it by reference into the Consent Order. (*See id.* ¶ 7.)

Accordingly, the Court now proceeds to determine whether there is good cause to rescind the Consent Order and the Lease Agreement, based on a mutual mistake.

II.    **There is no good cause to rescind the Consent Order and Lease Agreement because there was no mutual mistake**

As mentioned above, Defendants argue that the facts here establish a mutual mistake because "when the Stipulation of Settlement was signed and filed by both parties on . . . November 18, 2020, both parties believed that the base of the Unipole could be located near to the grade of the MTA parking lot." (Resp. in Opp'n at 7.) Defendants argue "[t]his mistaken belief is confirmed by the actions of both parties" during the December 2, 2020 meeting in which the Major marked a tree near the MTA parking lot. (*Id.*) As such, Defendants argue that the parties only "agreed to

an 80' pole as measured from the MTA parking lot" based on the original "+/- 95' AMSL" ground elevation estimates and that Plaintiff did not express any other concern. (*Id.*) But the Court disagrees.

Courts interpret a settlement agreement according to the general principles of contract law. *See Powell v. Omnicom*, 497 F.3d 124, 128 (2d Cir. 2007) (internal citations omitted); *Geller v. Branic Int'l Realty Corp.*, 212 F.3d 734, 737 (2d Cir. 2000). New York law permits reformation or rescission of a contract for mutual mistake. *AMEX Assurance Co. v. Caripides*, 316 F.3d 154, 161 (2d Cir. 2003); *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991). "As used in the doctrine of mutual mistake, mistake means being in error in one's belief as to what the contract states." *Id.* at 162 (internal quotation marks omitted).

However, rescission is appropriate only "when the parties have made a mutual mistake as to a fact or assumption which goes to the heart of the agreement." *Beecher v. Able*, 441 F. Supp. 426, 430 (S.D.N.Y. 1977). To demonstrate mutual mistake, the party claiming mistake must prove that the parties to the contract both "shared the same erroneous belief as to a material fact" at the time that they entered into the contract and that the contract thus failed to accomplish their mutual intent. *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 46 (2d Cir. 1991) (internal citations omitted).

Here, as Plaintiff correctly points out, the Lease Agreement indicates that the parties expressly agreed that Plaintiff would lease the Lease Area to build a Unipole with a maximum height of 80 feet "*as shown on Exhibit B*." (*See* Mot., Ex. 3 ¶¶ 1, 7 (emphasis added).) The Lease Agreement further indicates that the parties expressly agreed that "[Plaintiff] *may survey* the [Lease Area]" and that "[u]pon completion, the survey *shall replace Exhibit 'B' in its entirety*." (*Id.* ¶ 1 (emphasis added).) Hence, the Lease Agreement indicates that the parties (1) knowingly executed the Lease Agreement with the full acceptance that a survey had not yet been completed; (2) expressly agreed that Plaintiff would build the Unipole with a maximum height of 80 feet in accordance with the

13

estimates on Exhibit B; and (3) expressly agreed that if Plaintiff conducted a survey of the Lease Area, that such survey and its new estimates, if any, would *replace* the parties' original estimates on Exhibit B *and* that Plaintiff would build the Unipole in accordance therewith.

To be sure, the Court agrees with Defendants that the facts indicate that at the time they signed the Consent Order, both parties believed that the estimated ground elevation where Plaintiff would build the Unipole was "+/- 95' AMSL" and that the base of the Unipole "could be located near to the grade of the MTA parking lot." (Resp. in Opp'n at 7.) Indeed, Plaintiff does not appear to dispute any of those factual assertions. Yet, it is also undisputed that, about a week after the Court entered the Consent Order and just days before the December 2, 2020 meeting, the parties knowingly executed the Lease Agreement on November 30, 2020, with the full acceptance that a survey had not yet been completed, and also *expressly* agreed that if Plaintiff conducted a survey, the estimates of that survey—and not the original ones—would govern the construction of the Unipole.

Thus, if anything, while Defendants may have relied on inaccurate estimates when executing the Lease Agreement, by the express provisions of that agreement that they themselves negotiated and agreed with Plaintiff, they also knowingly assumed the risk of Plaintiff (i) conducting a survey that could reveal any potential inaccuracies of the original estimates; and (ii) building the Unipole based on the survey's new estimates, *regardless* of how much they differed from the original ones.

Therefore, the Court concludes that "[t]here was no . . . mutual mistake" here because while the parties may have mistakenly relied on inaccurate estimates at first, "this error would only be a matter of degree and would not go to the 'heart of the agreement'"—which, as evidenced by the Lease Agreement, was to build a Unipole with a maximum height of 80 feet within the Lease Area *regardless* of whether those initial estimates later turned out to be inaccurate. *Beecher*, 441 F.

Supp. at 430, *aff'd*, 575 F.2d 1010 (2d Cir. 1978).

Accordingly, as Defendants agreed to such terms after making "a deliberate, strategic choice to settle, [they] cannot be relieved of such a choice merely because [their] assessment of the consequences was incorrect." *United States v. Bank of New York*, 14 F.3d 756, 759 (2d Cir. 1994) (citing *Ackerman v. United States*, 340 U.S. 193, 198 (1950) (litigants cannot be relieved of the consequences of their strategic decisions merely because hindsight indicates that a decision was wrong)); *see also Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 445 (2d Cir. 2005) (noting that "a party's subsequent change of heart will not unmake a bargain already made." (citations omitted)); *Majority Peoples' Fund for 21st Century, Inc.*, 159 F.3d 1347 (2d Cir. 1998) ("Settlement agreements are strongly favored in New York and may not be lightly cast aside.").

### III. But Plaintiff fails to meet its burden for the Court to hold Defendants in contempt

That said, the Court agrees with Defendants that Plaintiff fails to establish by clear and convincing evidence that they failed to comply with the Consent Order. (Resp. in Opp'n at 8.)

"[A] contempt order is a 'potent weapon' that is inappropriate if 'there is a fair ground of doubt as to the wrongfulness of the defendant's conduct.'" *Latino Officers Ass'n City of N.Y., Inc. v. City of N.Y.*, 558 F.3d 159, 164 (2d Cir. 2009) (internal citations omitted). To establish contempt for failure to obey a court order, the movant must show that (1) the order the alleged contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the alleged contemnor has not diligently attempted to comply in a reasonable manner. *New York Real Est. Inst., Inc. v. Jammula*, 379 F. Supp. 3d 266, 269 (S.D.N.Y. 2019) (internal quotation marks and citations omitted). Although an evidentiary hearing is often necessary to resolve motions for contempt, "[n]o hearing is required . . . where there are no material facts in dispute." *New York State Nat'l Org. For Women v. Terry*, 697 F. Supp. 1324, 1330 n.6 (S.D.N.Y. 1988) (citations omitted).

"In the context of civil contempt, the clear and convincing standard requires a quantum of proof adequate to demonstrate a 'reasonable certainty' that a violation occurred." *Id.* (citations omitted). "Although the [alleged contemnor's] conduct need not be willful, a [movant] must also prove that . . . the [alleged contemnor] has not been reasonably diligent and energetic in attempting to comply [with a settlement agreement]." *Id.* (citations omitted).

Here, as a preliminary matter, the Court notes that there is no need for an evidentiary hearing to resolve Plaintiff's motion to hold Defendants in civil contempt because the parties do not point to any material facts in dispute. *Terry*, 697 F. Supp. at 1330 n.6 (citations omitted). As such, the Court resolves Plaintiff's contempt motion based solely on the parties' submitted declarations.

After reviewing the parties' submitted declarations, the Court is of the view that Plaintiff, at best, has only established the second element: that Defendants' noncompliance is clear and convincing. This is because Defendants themselves effectively concede that they did not issue any building permit to Plaintiff due to the parties' purported mutual mistake that they believed constituted good cause to rescind the parties' settlement agreement. (Resp. in Opp'n at 7–8.)

However, Plaintiff still fails to establish the other two elements by clear and convincing evidence. First, insofar as Plaintiff contends that Defendants failed to comply with the Consent Order due to their failure to issue a building permit to Plaintiff based on the survey's new estimates, the Court is of the view that the relevant provision in the Consent Order is not sufficiently clear and unambiguous. Specifically, such provision provides that "Defendants shall issue Plaintiff a building permit for the Unipole . . . within 30 days of the receipt of a complete Building Permit application with the Unipole . . . *as designed and located as shown on Exhibit A*." (Consent Order ¶ 5 (emphasis added).) As discussed above, at the time the parties signed the Lease Agreement on

16

November 30, 2020, Exhibit A of the Consent Order was the same document as Exhibit B of the Lease Agreement. (*See* Reply at 6.) But while the parties agreed in the Lease Agreement that Plaintiff's survey would replace Exhibit B in that document, Plaintiff fails to establish by clear and convincing evidence that the parties similarly intended such survey to *also* replace Exhibit A of the Consent Order.

The Court recognizes that the parties incorporated the Lease Agreement by reference to the Consent Order, which the Court could construe as evidence that the parties intended Plaintiff's survey to also replace Exhibit A to the Consent Order. (*See* Consent Order ¶ 7.) However, such evidence is insufficient by itself for Plaintiff to meet its burden for the first element by clear and convincing evidence. Moreover, nowhere in its reply does Plaintiff point to any evidence from the parties' submitted declarations and exhibits that would help it establish this burden by clear and convincing evidence.

And even when assuming that Plaintiff did establish that the relevant provision in the Consent Order was clear and unambiguous, the Court is still of the view that Plaintiff fails to establish by clear and convincing evidence that Defendants did not diligently attempt to comply with the Consent Order in a reasonable manner. Indeed, Plaintiff neither makes any argument nor points to any evidence indicating that Defendants failed to diligently review and process its building permit application for the Unipole. If anything, by its own submitted declarations and exhibits, Plaintiff concedes that upon receiving its building permit application, Defendants diligently reviewed it and deemed it complete on June 28, 2021. (*See* Mot., Ex. 5.) And once again, nowhere in its reply does Plaintiff point to any evidence from the parties' submitted declarations that would help it establish its burden with respect to the third element by clear and convincing evidence.

Accordingly, the Court concludes that Plaintiff has failed to meet its burden in establishing by clear and convincing evidence that holding Defendants in civil contempt is warranted.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiff's request for enforcement of the parties' settlement agreement and DENIES its request to hold Defendants in civil contempt (ECF No. 39.) Specifically, the Court GRANTS Plaintiff's request seeking to compel Defendants to comply with all provisions of the settlement agreement, including the issuance of a building permit in accordance with the terms of the settlement agreement. The Clerk of Court is directed to enter judgment in Plaintiff's favor accordingly, and to terminate the motion at ECF No. 43.

Dated: July 27, 2022
White Plains, NY

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge